UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:16 CR 000159 AGF |
| | ) | |
| LOREN ALLEN COPP, a/k/a/ "Sensei," | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Jennifer A. Winfield, Assistant United States Attorney for said District, and files its sentencing memorandum:

On December 26, 2018, Defendant Loren Copp ("Copp") was found guilty by this Honorable Court on Counts One and Two: Production of Child Pornography in violation of Title 18 U.S.C. Section 2251(a); Count Three: Attempted Production of Child Pornography in violation of Title 18 U.S.C. Section 2251(a); Count Four: Possession of Child Pornography in violation of Title 18 U.S.C. Section 2252(a)(5)(B); Counts Five and Six: Use of Interstate Facilities to Persuade, Induce, Entice, or Coerce a Minor to Engage in Sexual Activity in violation of Title 18 U.S.C. Section 2422 and Counts Eight and Nine: Use of Interstate Facilities to Transmit Information with the Intent to Entice, Solicit or Encourage a Minor to Engage in Sexual Activity in violation of Title 18 U.S.C. Section 2425.

The parties do not have an agreed upon sentencing recommendation.   The government believes the defendant's Total Offense Level is forty-three (43), which is a guideline sentence of life in imprisonment.  The Final Pre-Sentence Report ("PSR") states that the Total Offense Level

1

is 43, his criminal history level is I, and the guideline range is life.  The government has weighed the circumstances of this case, along with other similarly situated defendants in this district in the past, and is therefore requesting the following sentences to be run consecutive to each other: Count One:  Production of Child Pornography (360 months); Count Two: Production of Child Pornography  (360 months); Count Three: Attempted Production of Child Pornography (360 months); Count Four: Possession of Child Pornography (240 months); Count Five: Use of Interstate Facilities to Persuade, Induce, Entice, Coerce a Minor to Engage in Sexual Activity (240 months); Count Six: Use of Interstate Facilities to Persuade, Induce, Entice, Coerce a Minor to Engage in Sexual Activity (240 months); Count Eight: Use of Interstate Facilities to Transmit Information with the Intent to Entice, Solicit or Encourage a Minor to Engage in Sexual Activity (60 months); Count Nine: Use of Interstate Facilities to Transmit Information with the Intent to Entice, Solicit or Encourage a Minor to Engage in Sexual Activity (60 months).  Thus, the government respectfully requests that the Court sentence the defendant to an aggregate sentence of 1,920 months (160 years) in prison.

There were three identified minors who testified against Loren Copp – two of the girls he raped on a consistent basis and Copp produced images of all three identified victims.  There were several other minor girls whose photos and videos Copp meticulously organized into folders on computers, which had folders that contained child pornography files consistent with the sexually exploitative images of the identified victims that Copp produced.  Therefore, 160 years is the appropriate number of years Copp should spend in prison – to provide just punishment, to protect the community, and to give some measure of safety to his victims.

Copp is sexual predator who is deserving of a substantial sentence that will naturally produce community safety for the longest period of time available, which is the remainder of his natural life.  His patterned actions in this case, his utter lack of remorse, his repeated efforts to justify, deflect, explain away, and otherwise excuse his crimes, all prescribe a statutory maximum sentence for each count to run consecutive. This is especially true given that all of the evidence before the Court, which suggests Copp will not change; but instead will continue to present a significant danger to the community. A 160-year sentence is therefore sufficient but not greater than necessary to further the goals of sentencing. The government also requests a lifetime term of supervised release.

## A.    The Nature and Circumstances of the Offense

The instant offenses stem from the defendant's prolific sexual abuse of two named minor victims, and his extensive communications with other minor girls (including the three named victims) on Facebook under the alias name of "Chrissy."  Based on the records from Facebook, which consisted of several thousand pages, the "Chrissy" Facebook page goes back to at least December of 2013.  The "Chrissy" Facebook page appeared to belong to a thirteen (13) year-old female who lived in the China.   However, this Facebook account was created by Copp to trick and lure minor girls to chat with him and send him nude photographs.

The defendant was found guilty of eight (8) separate crimes concerning three (3) separate minor victims.  Evidence at trial revealed that "Jane Doe 1" and "Jane Doe 3" went to live with the defendant and his wife in south St. Louis County in 2009, while Copp serving as a minister at a local church.  (TR. Vol. VII at 54-55).  Soon thereafter Copp would touch "Jane Doe 1's" butt when "Jane Doe 3" was not around and called it the "butt game." (TR. Vol. II at 224). This progressed to Copp touching "Jane Doe 1's" breasts, butt, vaginal area, and eventually raping her.

(TR. Vol. II at 223).  "Jane Doe 1" was eleven years old when Copp first raped her. (TR. Vol. II at 224). This occurred multiple times a week when Copp's wife was not home. (TR. Vol. II at 224-225). On one occasion, Copp's wife came to the door of "Jane Doe 1's" bedroom when Copp was raping her.  Following, Copp jumped up, went to the door, and told his wife he was just waking up "Jane Doe 1." (TR. Vol. II at 227).

A short time afterward, an officer from the Division of Family Services came to the south county house and asked "Jane Doe 1" if she was being sexually abused, and "Jane Doe 1" denied the sexual abuse because she was afraid. (TR. Vol. II at 227).  Shortly afterward, Copp moved "Jane Doe 1" and "Jane Doe 3" to 4601 Morganford ("Dojo Pizza property") in St. Louis City. The Defendant was the only adult who lived with the children at this address full time. (TR. Vol. II at 227-228).  Also, while living at the Dojo Pizza property, Copp continued to sexually abuse "Jane Doe 1," and take sexually explicit pictures of "Jane Doe 1's" vagina, breasts, and buttocks. (TR. Vol. II at 229).

At trial, "Jane Doe 3" testified that she was five years old when she first met the Defendant Copp at church. (TR. Vol. IV at 88).  She was living with her mother and siblings until she and "Jane Doe 1" moved in with Copp and his wife. (TR. Vol. IV at 88-89).  "Jane Doe 3" started to feel uncomfortable around Copp when she was six years old. (TR. Vol. IV at 90).  Copp would play "butt tag" with the young girls and run around hitting their behinds. (TR. Vol. IV at 90). This progressed into Copp touching "Jane Doe 3's" vagina, fondling her nipples, and telling her to keep it to herself. (TR. Vol. IV at 90).  "Jane Doe 3" did not tell anyone about Copp's sexual abuse because she was nervous about being judged. (TR. Vol. IV at 91).

When Copp's wife was not home, Copp refused to let "Jane Doe 3" bath herself and demanded that he wash her body. (TR. Vol. IV at 91).  "Jane Doe 3" testified that Copp entered

4

the tub with her, lifted her up and brushed his genitals against her. She got out of the tub and maintained she could wash herself but Copp refused. (TR. Vol. IV at 91). After Copp took her out of the bath, he put her in a towel, lay her on the master bed, and use petroleum jelly to force his penis inside her. (TR. Vol. IV at 92).  Copp also raped "Jane Doe 3" and recorded it. (TR. Vol. IV at 92).  "Jane Doe 3" identified the video camera Defendant used to record her. (TR. Vol. IV at 94).

Eventually, Defendant moved "Jane Doe 3" and "Jane Doe 1" to the Dojo Pizza property. The building was filled with office equipment for a school and church and the girls only had air mattresses. (TR. Vol. IV at 95). Without Copp's wife at the Dojo Pizza property, the sexual abuse exponentially increased.  "Jane Doe 3" testified to being raped more than three times a week by Copp while at the Dojo Pizza property, which occurred in Copp's bedroom as well as his office. (TR. Vol. IV at 98-99).  Copp also made "Jane Doe 3" watch sexually explicit movies with him in his office on the desktop computer. (TR. Vol. IV at 149).

At trial, "Jane Doe 5" testified she was in middle school when she first met Defendant in 2013. He would come to her school to do karate classes and sell pizzas. (TR. Vol. II at 178). At that time, "Jane Doe 5" knew Defendant as "Sensei" and lived at home with her mother. (TR. Vol. II at 178-179). "Jane Doe 5" was friends with some of the girls that lived at 4601 Morganford and started visiting the Dojo and spending the night. (TR. Vol. II at 179). At some point, "Jane Doe 5's" mother was arrested and taken to jail, and "Jane Doe 5" started spending more time at the Dojo, eventually moving in permanently. (TR. Vol. II at 179-180).

When "Jane Doe 5's" mother was released from jail, she signed documents transferring "Jane Doe 5's" custody to Defendant. (TR. Vol. II at 181). Defendant became "Jane Doe 5's" guardian.  While "Jane Doe 5" lived at 4601 Morganford, "Jane Doe 1" and "Jane Doe 3" lived

5

there as well. (TR. Vol. II at 178-180). Eventually, "Jane Doe 2" and "Jane Doe 9" also moved

into the Dojo due to their mother's drug problems.  Defendant obtained custody of "Jane Doe 2"

and "Jane Doe 9." (TR. Vol. II at 180-181). "Jane Doe 5" shared a room and bathroom with the

other girls. They all worked in the pizza restaurant at the Dojo and were homeschooled online.

(TR. Vol. II at 182). When friends came over, the girls played "booty tag," with Copp, which was

the same as regular tag but involved touching each other's behinds. (TR. Vol. II at 183).

       In addition, "Jane Doe 5" testified that on one occasion Copp purchased a douche for "Jane

Doe 5" to use to ensure that she did not have lice in her genital area.  (TR. Vol. II at 98). The topic

of lice came up regarding "Jane Doe 5's" genital area, after Copp (while posing as "Chrissy" on

Facebook), told "Jane Doe 3" that it appeared "Jane Doe 5" had lice in her genital area.  (TR. Vol.

II at 149).  Following, "Jane Doe 5" did not know how to use a douche so Copp offered to help

"Jane Doe 5."  While helping "Jane Doe 5" with the douche, Copp put his hands on her vagina and

attempted to insert the douche.  (TR. Vol. II at 198-199). "Jane Doe 5" also disclosed that once,

when she had a stomach virus, she was lying in Copp's bed and fell asleep watching television.

She awakened crying and with cramps, that is when she observed that Copp was lying awake, next

to her in the bed. Copp placed his hand on her bare abdomen, just above her genital area, and began

rubbing her abdomen. "Jane Doe 5" was uncomfortable with the situation so she lied and told

Copp that she had to go to the bathroom. She left his bedroom and did not return. [1]  Lastly, during

trial all of the victims identified the photos of themselves in a lascivious display of their genitals,

as well as the video of the victims undressing at the church, which were all located on Copp's

computers - **Trial Exhibits 1, 2** and **3**.

---

[1]  Child Advocacy Interview of "Jane Doe 5"

In summary, during trial Detective Stewart Deken with the Regional Computer Crime Education and Enforcement Group ("RCCEEG") testified concerning his examination of **Trial Exhibits 1** and **2**, which were seized from Copp's residence and contained numerous erotic and sexually explicit pictures of various minor victims in this case, as well as other minor females. First, on **Trial Exhibit 2** Det. Deken located photos taken of a computer screen in the background, which appeared to be sexually explicit images of an identified minor victim, as well as several other pictures that depicted printed photos of the same child pornography with a penis and/or semen on or near the photos. Det. Deken testified that all of the aforementioned photos were emailed from two of Copp's email addresses from a T-Mobile phone, and the systems indicated that all of the emails were opened/read.[2]

At trial, Det. Deken also testified that he located two videos, which appeared to depict unidentified females in a shower with a focus on the genital region of the females. These videos appeared to have been taken from a hidden vantage point behind a screen or mesh of some kind, and numerous still photos, which appeared to be screenshots of the aforementioned videos, were all located on Copp's computer - **Trial Exhibit 2**. The aforementioned shower area was located in the residence shared by the victims and Copp.

Det. Deken testified that he also found several documents and emails on Copp's computer **Trial Exhibit 2**, which appeared to be sexually coercive or deceptive and directed towards "Jane Doe 1." The emails were between an email address linked to defendant Copp and a Yahoo email account for "L.Baker," who a fictional school resource officer created by Copp.[3] Det. Deken further testified that all of the aforementioned email messages were marked by the system as "read"

---

[2] Det. Deken's testimony can be found in Trial Transcript (Vol. 4 and 5)
[3] Trial Transcript (Vol. 2) pg. 65-69 and Doc. 216, Order, Findings and Conclusions pg 15-16

and the majority of these emails were sent from the same IP address that was attached to several emails from Copp's email account.

Additionally, Det. Deken testified that he located notes from Copp to "Jane Doe 1," "Jane Doe 3," and "Jane Doe 5."  One specific note to "Jane Doe 1" referred to the victim as "My secrete wife." As referenced above, "MRCKA" was the author and last editor of the "My secrete wife" document, and another document titled "May Pizza flyer 3. Pub."  That pizza flyer was a menu/flyer for Dojo Pizza, which contained a misspelling of the same "secrete" word. Specifically, Det. Deken testified that the May pizza flyer document read "Your mouth will love the taste of our secrete sauce combined with our fabulous crust….."   In addition, a search for documents with similar misspellings of "secret" (as "secrete") revealed two documents on Copp's computer, which contained similar spellings:

- *I John 2 A.doc (located in the file path "Users/Loren/Documents/Clean desk top /I john")*
- *Revelation chl.ppt (located in the file path "Users/Loren/Documents/LOren/Loren's Folder/Sermons"*

Other documents located on Copp's computer referenced Copp or were otherwise related to Copp or his business, which included a Power of Attorney regarding "Jane Doe 5."  Det. Deken further testified that on **Trial Exhibit 2**, he was able to locate several other identifiers for defendant Copp, Dojo Pizza, and "MRCKA" including authorship or editing documents, email addresses and Internet Explorer records.

Next, Det. Deken testified that he examined a second computer - **Trial Exhibit 1**, which also contained numerous erotic and sexually explicit pictures of various minor victims in this case as identified by investigators.  Det. Deken examined **Trial Exhibit 1** and noted that the computer's name was "Loren-PC," the OS registered owner was "Loren" and there was only one user created

account on the system, which was "Loren" and a it had logon password of "majiryu."

Det. Deken also found two Microsoft Word documents on Copp's second computer that contained numerous images of child pornography imbedded in them, which showed that "MRCKA" was the author and last editor.  Det. Deken explained that one of the Microsoft Word documents, which contained child sexually explicit images, was labeled "IT Hamster.docx," and the second document was labeled "Doc1.docx."  In the same folder containing the aforementioned sexually explicit documents, were other documents created around the same time entitled "lower blood pressure.docx," "Pizza Fundraiser 8 25.docx," "Living Faith Christian Academy," "MRCKA's Dojo Pizza" and other documents bearing Copp's name, numerous promotional materials for Dojo Pizza, pay stubs, credit card bills and health insurance forms in Copp's name, as well as a fax cover sheet in which Copp was listed as the sending party.   Lastly, Det. Deken discovered a tax-exempt letter to Defendant for Ma-JiRyu Christian Karate Association, which explains the prominence of the initials MRCKA and Ma-JiRyu 1.  (TR. Vol. IV at 169).

Next, Det. Deken testified that 14 of the 16 aforementioned "L. Baker" emails which were found on **Trial Exhibit 1**, were the same "L.Baker" emails found on **Trial Exhibit 2**.  Det. Deken further testified that on **Trial Exhibit 1**, he located numerous photographs, which appeared to be taken from the hidden shower vantage point as described above in **Trial Exhibit 2**.  These files found on **Trial Exhibit 1** had identical names and hash values to many of the shower "snapshot" files found on **Trial Exhibit 2**. In addition, he located evidence of *Peer-to-Peer* software, which had been installed on the system and commonly used in the downloading amd sharing of child pornography, and on **Trial Exhibit 1**, there were numerous files with names indicative of child pornography.  Officer Deken did not find any evidence that the dates and times of the files were tampered with. (TR. Vol. V at 123).

9

The Government also presented testimony of Detective Ken Nix with the Regional Computer Crime Education and Enforcement Group ("RCCEEG"), concerning his examination of a **Trial Exhibit 3** seized from Copp's residence, and contained numerous erotic and sexually explicit pictures, as well as video of minor victims in this case as identified by investigators. Detective Nix testified that he found the video described in Count Three of the indictment. [4]

There were also video still captures from two movies, which depict "Jane Doe 3" and "Jane Doe 4" undressing and in a lascivious display of their genitals. Det. Nix further testified that he discovered multiple thumbnail pictures which displayed "Jane Doe 1," "Jane Doe 3" and "Jane Doe 4," dressing and undressing and showing their breasts, as well as several pictures of an adult male having sex with what appears to be a minor female. These items were in subfolders within the My Pictures folder in the file path "Pictures/karate camp." Det. Nix also testified that there was a document titled "Custody letter_August 2007" purported to be made by Copp. During his analysis of the aforementioned files, Det. Nix discovered that the file names were changed and titled with the versions of "Jane Doe 1" and "Jane Doe 4" names.

Det. Nix also discovered that Copp was the registered user for the operating system on this hard drive. (TR. Vol. IV at 39). Det. Nix also testified that the information within the file could not be altered by manipulating the bios dates and clocks. (TR. Vol. IV at 54). Additionally, the bios clocks could not be manipulated remotely. (TR. Vol. IV at 59). There was also no evidence that the operating system was accessed remotely. (TR. Vol. V at 58).

Investigator Donya Jackson of the United States Attorney's Office for the Eastern District of Missouri, testified at trial regarding her review and analysis of the contents on **Trial Exhibits 1, 2** and **3**. Investigator Jackson also reviewed and assessed the video and images of child

---

[4] Det. Nix's testimony can be found in Trial Transcript (Vol. 4) pg. 1-40

pornography described in and charged in the Indictment.  During trial Investigator Jackson testified that she also discovered a Facebook account utilized by Copp, which purported to be used by a 13 year-old named "Chrissy." [5]

Investigator Jackson testified that the "Chrissy" Facebook account depicted a facial image of a minor female with dark hair and green background for the profile picture, and a Facebook picture ID which were located in the: Users\Loren\pictures\ folder on Copp's computer - **Trial Exhibits 1**.  Investigator Jackson also testified that her review of the "Chrissy" Facebook account revealed that most of the child sexually explicit images received by "Chrissy's" Facebook account (which included numerous sexually explicit images of the victims), were saved to Copp's computer media with the same Facebook picture ID numbers linked to the same images received by "Chrissy."  Investigator Jackson testified that Facebook records show that "Jane Doe 1," "Jane Doe 3" and "Jane Doe 5" were Facebook messaging with "Chrissy" and sending lewd and lascivious images at the request of Copp posing as "Chrissy."  In addition, in the aforementioned Facebook chats: (1) "Chrissy" refers to defendant Copp as "grandpa" or "gp," and in total, "grandpa" or "gp" is referred to numerous times throughout the Facebook messages.

Investigator Jackson testified that during her review of the Facebook account, in several instances where "Chrissy" asked for lewd and lascivious pictures of the aforementioned "Jane Does," the IP address that "Chrissy" was using to access the internet was the same IP address used by the "Jane Does."  Thus, this meant that both parties were located at the same physical address and using the same internet service.  Investigator Jackson also testified that the aforementioned IP address was also found in the forensic exam of Copp's computers, and multiple times this IP address was found in relation to emails sent by Copp's email account and other noted evidence

---

[5] Investigator Jackson's testimony can be found in Trial Transcript (Vol. 2, 3 and 7)

establishing that the IP address was assigned and used by defendant Copp as the means to access the internet at the Dojo Pizza residence.

Investigator Jackson further testified regarding an identified image depicting "Jane Doe 5" in a lascivious display of her genitals, and how this same image appeared to have been viewed on a black laptop computer screen by an adult male holding his erect penis in front of the computer. The focal point of the aforementioned picture is the tip of the penis as it lines up with "Jane Doe 5's" vagina.  Investigator Jackson explained that the new image, depicting "Jane Doe 5" and the male penis, was taken and saved on Copp's computer.

Investigator Jackson went on to testify that during the Facebook chats "Chrissy" directed "Jane Doe 1," "Jane Doe 3" and "Jane Doe 5" to take naked pictures, and these images were all saved on Copp's **Trial Exhibit 1**.  Additionally, the background in the aforementioned pictures of the "Jane Does" match the background of rooms located in the Dojo Pizza property. Investigator Jackson also testified regarding her analysis of Copp's computer media and the "Chrissy" Facebook account, where she assessed several emails purportedly to be from a School official named "L. Baker" (as described above).  Investigator Jackson testified that "Jane Doe 1" mentioned "L. Baker" three times to "Chrissy" throughout the Facebook messages.

Additionally, there was a Facebook chat where "Jane Doe 1" confronted the "Chrissy" profile, regarding "Jane Doe 1's" belief that "Chrissy" was actually defendant Copp, because "Jane Doe 1" heard Copp's computer device alerting when their Facebook messages were received. Even further, there was evidence presented that the subscriber information and backup emails used for the "Chrissy" Facebook account, as well as the "L.Baker" email account are both linked to Copp.  Investigator Jackson also testified regarding Facebook chats between "Chrissy" and other minor females who are "friends" with "Jane Doe 1," "Jane Doe 3" or "Jane Doe 5."  In some of

12

these chats, "Chrissy" persuaded one minor to date "grandpa" (Copp), and persuaded another minor to take naked pictures of herself and friends and send them to "Chrissy."

The Facebook records show that there were many more girls that Copp attempted to deceive, where he was successful in enticing the girls to send nude photos, such as "Jane Doe 8." Also during her testimony, Investigator Jackson discussed a "series" of pictures discovered on Copp's computers, which depict "Jane Doe 1" in a lascivious display of her genitals located within "Jane Doe 1's" bedroom at Copp's South County residence.  She also discussed another "series" of sexually explicit images depicting "Jane Doe 3" and "Jane Doe 5."  Investigator Jackson further testified that on **Trial Exhibit 1**, she analyzed and compared numerous files with names indicative of child pornography, as outlined in previous government filings.

In conclusion, Copp has sexually abused at least two known victims and victimized or attempted to victimize other minors online and therefore he should be sentenced to 160 years in prison for these criminal acts.

**B.**     <u>**History and Characteristics of the Defendant**</u>

Here, the defendant committed numerous crimes against children and, as the case is charged, the defendant's Total Offense Level for these crimes is not even listed in the guidelines.  Per paragraphs 71-73 of the PSR,

> "The defendant engaged in a pattern of activity involving prohibited sexual conduct, and the defendant is a repeat and dangerous sex offender against minors, so the applicable offense level is 55.  Therefore, as level 55 is in excess of 43, the offense level has to be treated as a level 43."

Therefore, the government believes that a sentence of 160 years in prison adequately reflects the seriousness of the offense provides just punishment for the offense.  In making a fair recommendation to the Court, the government has considered all of the evidence in this case.

Even further, Copp continues to deny his culpability in this offense, and even filed alleged letters of support from various community members that are all dated in 2015, before he was even charged and convicted of the instant offenses.  This is just another example of how defendant Copp always attempts to manipulate people and embellish situations in order to portray himself in a positive light when he well knows that he systematically destroyed the lives of multiple children and families.

C.    **Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Enticing and producing the sexual abuse of children is a serious offense and the guidelines reflect the seriousness of the crime.  The defendant possessed and produced numerous images of child pornography. These images depicted minor female children engaged in lascivious displays of their genitals that were sent to the defendant via Facebook Messenger at the defendant's request and sometimes even at his specific direction.  As discussed in more detail above, the defendant spent weeks and months grooming these children to send these images of child pornography to him and then stored images of them on his computers.  Additionally, he systematically sexually abused two of the victims over multiple years.

Due to the extensive number of victims the defendant preyed upon and the nature of the images the defendant possessed, the government believes imprisonment of 160 years is appropriate in this case.

D.    **To Afford Adequate Deterrence to Criminal Conduct and To Protect the Public from Further Crimes of the Defendant**

Reasonable yet firm sentences are necessary in these cases to prevent further sexual abuse and to reduce or eliminate the market for child pornography and to protect children from becoming victims to feed that market.  As this Court is aware, and as is reflected in the number of cases

14

occurring throughout this country, the number of child pornography cases has increased significantly over the last several years.  Firm prison sentences are necessary to deter the producing, viewing, possessing, collecting, and trading of child pornography.

Nelson Mandela has said that, "There can be no keener revelation of a society's soul than the way in which it treats its children." *United States vs. Cunningham,* 680 F.Supp.2d 844 (N.D.Ohio, 2010).  In referring to this quote, one federal court noted, "Given the recent statistics surrounding child pornography, we are living in a country that has lost its soul." *Id.* The public is abhorred by the thought of someone watching children being raped by adults, as well as adults raping children, which is what Copp did in this case.[6]  Yet, when these cases come before the Court, invariably there appear to be attempts to downplay the conduct by claiming the defendant was just "looking at images" that the internet made so easy to find.

Furthermore, Copp's attempt to lay the blame on St. Louis Metropolitan Police Department Detective Keaton Strong as the catalyst for the child pornography that Copp produced at his south county home and the Dojo Pizza property is absolutely ludicrous. According to the defendant, everyone is to blame for these crimes, except him.   As such, the Government objects to any downward variance.  The crimes that the Defendant was convicted of are crimes of violence, and should be treated as such.

Defendant knowingly created and possessed numerous images of child pornography.  These images in the defendant's collection depict child sexual abuse including images of children being raped, and the defendant sexually abused and raped children over several years.  Therefore, a guideline sentence is appropriate in this case.

---

[6] See Trial Exhibits (inclusive) 71-79 and 134-138.

The goal of sentencing is to "'impose a sentence sufficient but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed . . . correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). The Court considers the "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," "the kinds of sentences available," the applicable sentencing guideline range, any pertinent policy statement, sentences imposed on other similarly situated defendants, and the need for victim restitution. 18 U.S.C. § 3553(a).

### i.   The Court Can Take Into Account Relevant Conduct For Sentencing

The Court is well within its discretion to sentence the defendant to a sentence at the top of the guidelines applicable to the counts of conviction, taking into account all evidence. Just because the Court acquitted Copp on Count VII, does not mean that the government has not met its burden for sentencing. The Court has a different role at sentencing when compared to the finding of guilt stage. The Court heard evidence during trial that established the counts of conviction, and the Court is well within the bounds of its discretion to take into account relevant conduct – and to take into account the complete picture of the conduct presented to the Court during trial – in determining the proper guidelines calculation and ultimate sentence to impose. *United States v. Lasley*, 832 F.3d 910 (8th Cir. 2016)(holding that "a jury's acquittal establishes only that the government failed to prove an essential element beyond a reasonable doubt, and a sentencing court may consider the conduct underlying an acquitted charge if the conduct is proved by a preponderance of the evidence"); *United States v. Martin*, 777 F. 3d 984, 997 (8th Cir. 2015)(noting that the Eighth Circuit has repeatedly held that due process never requires applying more than a preponderance of

16

the evidence standard for finding sentencing facts, "even where the fact-finding has an extremely disproportionate impact on the defendant's advisory guidelines [sentencing] range"); *United States v. Maxwell*, 778 F.3d 719, 737 (8th Cir. 2015)(holding that "due to differing burdens of proof at trial and sentencing, district court may consider facts underlying an acquitted count that it finds to be sufficiently reliable").

Additionally, in determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. See 18 U.S.C. 3661; see also *United States v. Watts*, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); *Witte v. United States*, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); *Nichols v. United States*, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction).

Thus, as noted above, the district court at sentencing evaluates the facts by viewing a wide variety of reliable information using a preponderance of evidence standard. *United States v. McKanry*, 628 F. 3d 1010, 1020 (8th Cir. 2011), quoting, *United States v. Tyndall*, 521 F.3d 877, 883 (8th Cir.2008) ("[A] district court may use a defendant's relevant conduct in sentencing if it finds by a preponderance of the evidence that the conduct occurred, even if that conduct formed the basis of a criminal charge on which a jury acquitted the defendant."). Accordingly, "it is appropriate for the district court to consider facts underlying an acquittal when those facts appear to be sufficiently reliable and the government need not prove such facts beyond a reasonable doubt." *Id*. Uncharged, dismissed, and acquitted conduct may properly be considered "relevant

17

conduct" for sentencing purposes, and certainly may be taken into account in terms of the Court's findings under 18 U.S.C. § 3553(a). *United States v. Putra*, 117 S. Ct. 633 (1997)("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

At this juncture, considering the relevant factors, a sentence of 160 years imprisonment followed by a term of life on supervised release is the only thing that can provide deterrence and protect the community from Copp, who still refuses to accept that he destroyed the lives of these young girls. A lengthy sentence is the only thing that can impress upon Copp that this criminal behavior is not tolerated in society and assure a measure of safety to the community. A statutory maximum sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and to protect the public.

In addition, the plain language of U.S.S.G. § 5G1.2(d) allows consecutive terms so long as the "total punishment" as determined by the adjusted combined offense level is not exceeded. Specifically, "§5G1.2(d) of the guidelines requires that if the maximum sentence allowed under any one count does not reach the total punishment as calculated under the guidelines, the district court must impose consecutive sentences on the multiple counts until it reaches a sentence equal to the total punishment calculation under the guidelines. This is permissible, because imposing consecutive sentences on multiple counts does not violate *Apprendi* when the sentence for each count does not violate the statutory maximum for that count. *United States v. Diaz*, 296 F.3d 680, 684 (8th Cir.2002). Moreover, in order to avoid unwarranted sentencing disparities, it would also be appropriate to sentence the defendant in line with sentences for defendants convicted of engaging in similar conduct.

18

For example, in *United States v. Thomas Goodman*, following a guilty plea by the defendant to eight counts of production for three victims and one count of possession of child pornography, a court sentenced Goodman to 260-years (3,120 months).[7]  This sentence was reached by imposing the statutory maximum sentence of 30 years on each of the eight counts of production and the statutory maximum sentence of 20 years on the single count of possession to run consecutive.  In addition, in *Goodman*, the district court accurately described the behavior in creating child pornography as a "level of depravity [that] is beyond comprehension."[8]

Here, similarly, Copp's actions have gone well beyond the possession of child pornography and exhibit a level of depravity that defies comprehension.  Copp has taken the next egregious step and *created* new child exploitative material.  He then preserved and organized his collection, to be referred to at his convenience. He has thus caused the charged victims, as well as those who have not yet been identified, to wonder when someone looks at them for a second too long, or seems to smile knowingly, whether that person has seen the images documenting Copp's sexual exploitation.  These victims have had to live with the knowledge that Copp perpetrated these crimes against them at their most vulnerable moments, and he received enjoyment from those images.  He has not only robbed the victims of their innocence, but also permanently deprived them of a sense of security.

In addition, the government has weighed the circumstances of this case, along with other similarly situated defendants in the past who were sentenced in this district, as outlined below:

---

[7] United States v. Goodman, No. 18-141-JJM (D.R.I. Dec. 4, 2018)
[8] Rhode Island Man Gets 260 Years for Making Child Porn, available at https://www.usnews.com/news/best-states/rhode-island/articles/2019-03-22/rhode-island-man-gets-260-years-for-making-child-porn; see also Rhode Island man sentenced to 260 years in federal prison in ICE HSI Boston child exploitation case, available at https://www.ice.gov/news/releases/rhode-island-man-sentenced-260-years-federal-prison-ice-hsi-boston-child-exploitation.

| Defendant Name | Case Number | Sentence | Charges | Trial/Plea |
|---|---|---|---|---|
| Devlin, Michael | 4:07-CR-00143 JCH | 2010 months | Production - CP Transport of a Minor | Guilty Plea (4 counts) |
| Parsons, Gregory | 4:08-CR-00518 CDP | 720 months | Production – CP | Guilty Plea (2 counts) |
| Greenwell, Jeffrey | 4:09-CR-00757 CAS | 1200 months | Production - CP | Guilty Plea (5 counts) |
| Martin, Michael Paul | 4:09-CR-00760 JCH | 1440 months | Production - CP Possession – CP Receipt CP | Guilty Plea (5 counts) |
| Beasley, Leland | 4:10-CR-00119 CEJ | 3480 months | Production - CP Attempt Prod. | Jury Trial (12 counts) |
| Bleckler, Donald | 4:11-CR-00374 RWS | 660 months | Production - CP Possession - CP | Guilty Plea (4 counts) |
| Gravenmier, Jack | 4:12-CR-00464 JAR | 600 months | Production - CP Possession - CP | Guilty Plea (3 counts) |
| Smith, Jody Eugene | 4:13-CR-00476 HEA | 720 months | Production - CP Attempt Prod. Receipt - CP Transportation | Guilty Plea (4 counts) |

In addition, unlike *Goodman*, *Devlin*, *Parsons*, *Greenwell*, *Martin*, *Bleckler*, *Gravenmier* and *Smith*, who readily admitted their guilt and accepted their punishment, Copp continues to obfuscate and attempt to detract from his undeniable guilt. Copp's "smug" arrogance caused three girls to be re-victimized repeatedly when having to re-live and recount their sexual assaults at his hands, while Copp questioned them during trial which took place in a an open courtroom. Although *Goodman*'s victims were younger, *Goodman*'s actions amounted to molestation and sexual contact rather than sexual penetration and rape. Copp forcibly raped two girls and used deception to groom others into "willingly" providing sexually explicit images to him while posing as "Chrissy." Copp is exponentially worse than a typical child molester who feels no level of guilt

for the unquestionable depravity in which he engages.  Copp takes sick joy and pleasure from forcing his victims to testify, demonstrating "his desire to remain in control of his victims."

Accordingly, the government's request for a 160-year sentence for Copp's convictions is consistent with the sentences imposed on similarly situated defendants in this district and across the country, and it is substantively reasonable and warranted. A sentence of 160 years serves a strong deterrent purpose to Copp and other pedophiles and child rapists like him who believe they can "remain in control" by watching their victims reliving the worst horrors of their lives.

Furthermore, it is important for this Court to consider Copp's repeated refusal to admit any wrongdoing and accept responsibility for his actions. Notwithstanding the overwhelming testimonial and forensic evidence facing Copp, he has refused to admit the truth. To be clear, the government is not asking for a trial tax, or for the Court to punish Copp exercising his constitutional rights to a trial.  However, exercising a constitutional right is very different than pushing forward a factually unsupported and frivolous defense to distract from guilt.  Copp refused to admit the logical legal implications of his own criminal activity and proceeded to trial, requiring the victims to testify about their graphic victimization in a room filled with strangers, people they met in the days before trial, this Honorable Court, and Copp.  Even further, Copp's attempt at trial to claim that the forensic evidence was somehow manufactured or altered and planted by other people is nothing more than a delusion of grandeur.  Consequently, of course, this Court flatly rejected all of Copp's factually unsupportable defenses.

Here, Copp's refusal to accept responsibility up to the present day, even in light of what is painfully obvious to any reasonable observer of the trial proceedings, should be considered by this Court with great concern. In light of Copp's obstinate refusal to acknowledge his crimes and accept responsibility, this Court can have no assurance that anything other than a period of

incarceration spanning Copp's natural life will deter him from re-committing the offenses for which he has been found guilty.  Lastly, sentencing Copp to 160 years will avoid sentencing disparities and will impose a sufficient but not greater than necessary sentence.

**D.     Supervised Release**

The government maintains that Copp should be ordered to serve a lifetime term of supervised release as to Counts One thru Six, and a three year term of supervised release on Counts Eight and Nine.  If the Court imposes the government's requested sentence, it is unlikely that Copp will serve any term of supervision.  However, the egregiousness and escalation of Copp's conduct warrants the maximum term of supervision as a matter of fact and principle. The facts of this case strongly suggest that Copp's rehabilitation, success, and any likelihood to re-offend will be reduced if he remains accountable for his rehabilitation under supervision.

## Conclusion

The Government is requesting that the Court sentence the defendant to 1,920 months (160 years) in prison to be followed by a lifetime of supervised release.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

*/s/ Jennifer A. Winfield*
JENNIFER A. WINFIELD, #53350MO
Assistant United States Attorney
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63l02
jennifer.winfield@usdoj.gov
(314) 539-2200

22

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 10, 2019, the attached was filed electronically with the Clerk of the Court and served by way of this Court's Electronic Notification System upon all counsel of record, and mailed to Loren Copp at the St. Charles County Adult Detention Center, 301 N. Second Street, St. Charles, MO 63301.

*s/ Jennifer A. Winfield*
JENNIFER A. WINFIELD, 53350MO
Assistant United States Attorney

23